AEE–EMF, INC., et al., Plaintiffs,

and

Randy L. Spring, Respondents,

v.

Daniel P. PASSMORE, and Aircraft Electrical Electronics, Inc., et al., Appellants.

No. WD 48885.

Missouri Court of Appeals, Western District.

May 30, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 29, 1995.

Application to Transfer Denied Oct. 24, 1995.

Larry M. Schumaker, Carla D. Barksdale, Shook, Hardy & Bacon, Kansas City, for appellants.

Kelly C. Tobin, Joe A. Harter, McDowell, Rice & Smith, Kansas City, for respondents.

Before ULRICH, P.J., and LOWENSTEIN and HANNA, JJ.

ULRICH, Presiding Judge.

Daniel P. Passmore, Aircraft Electrical, Inc. (AE), and Aircraft Electrical Electronics, Inc. (AEE) appeal from the permanent injunction enforcing a five-year noncompetition agreement entered into between Mr. Passmore, Randy Spring and AEE–EMF, Inc. (AEE–EMF), a Missouri Corporation, and an aircraft electrical component repair business.[1] Mr. Passmore and Mr. Spring each owned fifty percent of AEE–EMF's stock. The injunction restricts Mr. Passmore from owning, operating, managing, or participating in "the ownership, operation or management of a rewinding and repair of aircraft components business for a period of five years within the continental United States." The injunction also prohibits AE and AEE "from using or disseminating to any other person or entity the confidential information of" Mr. Spring and AEE–EMF. The judgment of the trial court is affirmed as modified.

*FACTS*

Daniel P. Passmore and Randy Spring formed AEE–EMF in 1985. The corporation was engaged in the business of "rewind and repair" of aircraft electrical components. Mr. Passmore owned AEE and Mr. Spring owned EMF Control, Inc. (EMF). The two companies engaged in the business of "rewinding" (repairing) aircraft electrical components provided by airline customers. The profits of AEE–EMF went to the separate corporations owned by Mr. Passmore and Mr. Spring.

In October 1988, Mr. Spring, Mr. Passmore and AEE–EMF entered into a contractual agreement. The principal purpose of the agreement was to provide for acquisition of life insurance to provide for a buyout and to permit the corporation to continue in business in the event one of the two men died. The agreement also provided for the purchase of a stockholder's stock if he desired to quit the company and dispose of his stock. The contractual agreement provided for sale of the stock owned by either of the two men to the company, or if that option were not executed, by the other stockholder if he desired to purchase the stock, if one of the men invoked the disability provisions of the agreement. The noncompetition clause within the agreement provided that the person selling his stock pursuant to the agreement would not compete "for a period of five years from the date of the exercise of the option or from the time of the declaration of disability." Thus, the relevant portions of the agreement included (1) a provision for "key man" life insurance to purchase the shares from a decedent shareholders estate; (2) the company's right of first refusal to purchase the stock of a quitting shareholder and, should the company decline the purchase, the other shareholder's right to purchase the stock; and (3) a noncompetition clause restricting a quitting shareholder.

---

1. Mr. Spring and AEE–EMF filed suit in several counts asserting numerous theories of recovery.

Several counts remain pending in circuit court.

In 1993, Mr. Spring and Mr. Passmore entered negotiations for the sale of Mr. Spring's interest in the corporation to Mr. Passmore on terms which were not in accordance with the agreement. Negotiations were unsuccessful, and the agreement was never modified, terminated or abandoned.

Mr. Passmore resigned his positions as officer and director of AEE–EMF, surrendered his stock in the corporation, and the corporation, on November 2, 1993, was compelled to vacate its place of business in the facility owned by Mr. Passmore. Mr. Passmore then began a new business, defendant AE, which repaired aircraft electronic parts. Most of the employees of AEE–EMF resigned and began working for AE.

Prior to November 1, 1993, Mr. Spring, Mr. Passmore, and AEE–EMF had accumulated approximately 800 one-page documents known in the aircraft electrical maintenance business as "data sheets." These documents contained specifications for repairing various aircraft electric components. After Mr. Passmore tendered his resignation and surrendered his stock, Mr. Spring demanded that Mr. Passmore return all of the data sheets in his possession. Mr. Passmore refused this demand until he made copies of the data sheets.

On November 15, 1993, Mr. Spring and AEE–EMF filed their petition in this lawsuit. Count VII of Mr. Spring's petition sought to enjoin Mr. Passmore and AE from competing against AEE–EMF and prohibiting them from using or disclosing the "data sheets" in their possession. The trial court conducted a one-day hearing on December 21, 1993, and permanently enjoined Mr. Passmore and AE from engaging in the business of repairing aircraft electrical components in competition with AEE–EMF pursuant to the noncompetition clause in the agreement signed by Mr. Passmore, Mr. Spring and AEE–EMF. Mr. Passmore and AE appeal the trial court's permanent injunction.

### STANDARD OF REVIEW

Review of the trial court's action is pursuant to *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Therefore, the judgment will be affirmed unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Id.* at 32.

### ISSUES

#### (I)

Mr. Passmore asserts four points on appeal. In point one, Mr. Passmore claims that the trial court erred in enjoining him from competing because, he asserts, he did not breach an enforceable noncompetition agreement. Specifically, he claims that the parties to the 1988 agreement were not bound by its provisions; his actions did not implicate the noncompetition clause; and the noncompetition clause was never effected because neither Mr. Spring nor AEE–EMF timely exercised the purchase option to buy his stock, a requirement to effect the agreement.

■ Mr. Passmore's initial contention is that the parties rescinded or abandoned the agreement they entered into in 1988. The trial court found that the agreement was never modified, terminated, or abandoned; and the parties made no express rescission or new agreement. Mr. Passmore contends that through "words and acts" the parties abandoned the agreement. "Abandonment can be shown by acts and conduct consistent with the intent to abandon." *Land Improv., Inc. v. Ferguson*, 800 S.W.2d 460, 464 (Mo. App.1990). Mutual abandonment "must be clearly expressed, and acts and conduct ... must be positive, unequivocal, and inconsistent with the existence of the contract." *In re Estate of Reed*, 414 S.W.2d 283, 286 (Mo. 1967) (quoting 17A C.J.S. Contracts § 389, p. 467, fns. 63, 64).

Mr. Passmore argues that Mr. Spring's own testimony shows Mr. Spring abandoned the agreement. He claims Mr. Spring testified that he did not consider himself bound by the agreement when he made written proposal to Mr. Passmore in September and October of 1993 to terminate their business relationship. Additionally, Mr. Passmore argues that Mr. Spring's attorneys did not refer to the agreement in a November 1, 1993, letter discussing potential ways to end

Mr. Passmore's and Mr. Spring's business relationship. Mr. Passmore contends that these words and acts along with Mr. Passmore's surrendering his stock without financial remuneration allow an inference of mutual rescission or abandonment of the written agreement.

Mr. Spring's counter argument asserts that the parties never abandoned or rescinded the agreement. Mr. Spring admits he made proposals different than those specified in the written agreement, but he contends his proposals were made because Mr. Passmore was attempting to force him to sell his interest. Therefore, asserts Mr. Spring, his words and conduct were not inconsistent with the provisions of the agreement, and the parties remain bound by it.

Although Mr. Spring made proposals not included in the terms of the agreement, the parties never agreed to terms different from those in their formal binding agreement. The evidence supports the trial court's finding that the parties, intending to effect the agreement, acted on it. For example, pursuant to the agreement, AEE–EMF maintained life insurance on the lives of the two men to finance a buyout if one of them died. Although the parties negotiated change, the binding agreement was never explicitly rescinded, modified, or abandoned.

■ Next, Mr. Passmore argues that the trial court erroneously applied the noncompetition clause in the agreement because he received no consideration for his stock when he surrendered it, a condition precedent to invoking the noncompetition clause. However, the trial court found that "Passmore's actions prevented the corporation [AEE–EMF] and Spring from exercising their rights and duties under the agreement," thereby preventing AEE–EMF from exercising its right to buy Mr. Passmore's stock if it chose to. Thus, the trial court determined that although Mr. Passmore could have received remuneration for his stock from AEE–EMF in exchange for imposition of the restrictions he agreed to if the corporation exercised the purchase option, his conduct, which was tantamount to rejecting the remuneration to which he was entitled, did not negate imposition of the restrictions provided

by contract because he prevented AEE–EMF from exercising the option to purchase the stock.

Mr. Passmore claims that the noncompetition clause was expressly tied to the optional purchase terms of the agreement which were not activated because he merely surrendered his stock to AEE–EMF as opposed to selling it to the corporation. By the terms of the agreement, a "shareholder who desires to dispose of his shares during his lifetime shall first offer, in writing, all of his shares for sale to the company at a price determined by paragraph 4 and the company shall have the option to purchase all of his shares." Mr. Passmore did not offer his shares to the corporation for remuneration as provided by the agreement. Instead, he surrendered his stock, arguably to avoid the five-year noncompetition clause imposed by the agreement. Thus, Mr. Passmore's conduct precluded AEE–EMF from exercising its contractual opportunity to purchase Mr. Passmore's shares.

■ In *Hillis v. Blanchard*, 433 S.W.2d 276, 279 (Mo.1968), the Missouri Supreme Court found that "[o]ne who hinders performance by the other party may not avail himself of the nonperformance which he induced or occasioned." As noted in *Hillis*, 433 S.W.2d at 279, a party to a contract who hinders performance by the other party may not assert the non-performance which he induced. Similarly, in *Sassenrath v. Sassenrath*, 657 S.W.2d 671, 674 (Mo.App.1983), the court stated that "[w]here a defendant prevents the performance of a condition of a contract, the condition is excused." Implicit in this principle is the recognition that the party who is hindered or prevented from performing would have performed except for the acts of the inhibiting party. For example, in *Sassenrath*, the contract formed between appellant and respondent provided that the parties were to build a home on a parcel of real estate owned by respondents, and upon completion of the home, respondents would convey a life interest in the property to appellant. Sometime after construction began, a dispute developed between the parties and construction halted. Appellant's petition asserted that he was prepared

to finish the home in accordance with the parties' agreement but respondents failed to complete the house or allow appellant to complete it. *Sassenrath,* 657 S.W.2d at 672–74. In considering the appellant's petition, the court found that when performance of a condition precedent is prevented by the opposing party, the condition is excused. *Id.* at 674. The rule is stated in *Schulte Transp. Co. v. Hewitt,* 299 S.W.2d 568, 573 (Mo.App. 1957), as follows: "[I]f a promisor prevents or hinders the occurrence, happening or fulfillment of a condition in a contract, and the condition would have occurred or happened or would have been fulfilled except for such hindrance or prevention by the promisor, then the performance of the condition is excused."

Mr. Passmore's actions in establishing a competing business, hiring away the majority of AEE–EMF's employees, obtaining for his new business the clients of AEE–EMF, and surrendering his stock without demanding remuneration supports the conclusion that Mr. Passmore intended to avoid the noncompetition clause and surrendered his stock to AEE–EMF to prevent Mr. Spring and the corporation from being able to exercise the purchase option. The trial court's ruling that Mr. Spring and AEE–EMF were excused from purchasing Mr. Passmore's stock to invoke the noncompetition clause in accordance with the agreement was supported by substantial evidence, was not against the weight of the evidence, and neither erroneously declared nor erroneously applied the law. *Murphy,* 536 S.W.2d at 32. Point I is denied.

## II.

As their second point on appeal, Mr. Passmore and AE assert that the trial court erred in enjoining them from conducting their aircraft electrical component repair business in competition with AEE–EMF because the imposed noncompetition restriction was not reasonably necessary to protect AEE–EMF's legitimate interests in that: (a) Mr. Passmore's "customer contacts" predated the formation of AEE–EMF by several years; (b) AEE–EMF had no protectable trade secrets warranting five-year noncom-

petition restriction; and (c) the five year noncompetition restriction applicable throughout the entire United States was excessively broad to protect AEE–EMF's business interest.

The purpose of restrictive covenants is to protect an employer from unfair competition by a former employee without imposing unreasonable restraint on the employee. *Continental Research Corp. v. Scholz,* 595 S.W.2d 396, 400 (Mo.App.1980). The ordinary rules of contractual construction and enforcement are not necessarily applicable to non-compete agreements. *Id.* at 399. Temporary and spatially limited restraints on a former employee's ability to compete with his former employer articulated in a covenant not to compete are enforceable if reasonable under all attending circumstances and if enforcement serves the employer's legitimate interests. *Mo–Kan Cent. Recovery Co. v. Hedenkamp,* 671 S.W.2d 396, 399 (Mo.App.1984). However, noncompetition agreements are not favored in the law, and one endeavoring to enforce a noncompetition agreement must demonstrate necessity to protect the claimant's "legitimate interests." *A.B. Chance Co. v. Schmidt,* 719 S.W.2d 854, 857 (Mo.App.1986). Missouri courts have identified two such "protectable interests." These are customer contacts and trade secrets. *Mo–Kan Cent. Recovery Co. v. Hedenkamp,* 671 S.W.2d at 399; *Continental Research Corp. v. Scholz,* 595 S.W.2d at 400.

Restrictive covenants limiting the exercise or pursuit of an individual's occupation are in restraint of trade, and to be valid and enforceable, they must be reasonable as to time and space. *Osage Glass, Inc. v. Donovan,* 693 S.W.2d 71, 74 (Mo. banc 1985). To the extent that a non-compete agreement is not demonstrably reasonable, it will not be enforced. *Continental Research Corp.,* 595 S.W.2d at 400. The party claiming benefit of a noncompete clause within a contract has the burden of proving the reasonableness of the clause. *Id.* Noncompete clauses not demonstrably reasonable are not enforceable, and refusal to effect unreasonable terms does not constitute impermissible judicial "re-writing" of an agreement. *Id.* The rules appli-

cable to enforcing noncompete agreements emanate from the purpose of such agreements, to protect a business entity from unfair competition by a former business associate without imposing unreasonable restraint on the latter. *Id.* Protection of a former business associate and not punishment of the opposing business associate is the essence of the law. *Id.*

### (a)

Mr. Passmore contends that the imposed noncompetition restriction was not reasonably necessary to protect AEE–EMF's legitimate interests because Mr. Passmore's customer contacts predated the formation of AEE–EMF by several years. Implicit in Mr. Passmore's contention is recognition that customer contacts are a protectable commodity of a former employer or a former business partner.[2] *Refrigeration Indus., Inc. v. Nemmers,* 880 S.W.2d 912, 921 (Mo.App. 1994); *Orthotic & Prosthetic Lab, Inc. v. Pott,* 851 S.W.2d 633, 643 (Mo.App.1993). A party endeavoring to enforce an express agreement not to compete against a former employee or business partner normally need not show existence of a secret customer list. *See Osage Glass, Inc. v. Donovan,* 693 S.W.2d at 74. A fundamental reason that customer contacts are recognized as a protectable commodity under the protection of noncompete agreements is the understanding that goodwill develops between the customers and the company through employees or business partners whose job it is to meet with, converse with, and develop a professional relationship with the company's customers while representing the company. The goodwill that develops from customer contacts between the salesman or business partner and the company's customer is es-

sential to the companies success and is the reason the employee or the business partner is remunerated. The goodwill that develops results in sales of the company's product or services. Therefore, an employer has a protectable right in both customers and goodwill. *Refrigeration Indus., Inc. v. Nemmers,* 880 S.W.2d at 921.

When attempting to enforce a noncompete agreement, the proponent need not prove actual attempts to solicit the former employer's customers. *Osage Glass, Inc. v. Donovan,* 693 S.W.2d at 75. Neither must the former employer show actual damages if the covenant is lawful and the opportunity to influence employer's customers exists. *Id.*

Mr. Passmore's claim that his customer contacts predated formation of AEE–EMF, and should therefore not be considered a protectable commodity covered by the noncompete agreement, eludes the purpose for protecting customer contacts. When Mr. Passmore engaged his efforts in behalf of AEE–EMF, he was developing goodwill for the company. The company and Mr. Spring as the other stockholder had a right to expect Mr. Passmore's best effort in developing goodwill for the company in exchange for the remuneration Mr. Passmore received for his effort. Mr. Passmore contributed to AEE–EMF the customer contacts developed prior to formation of AEE–EMF along with the goodwill he developed before formation of the company. This was part of his contribution when he and Mr. Spring formed AEE–EMF just as Mr. Spring contributed the customer contacts and goodwill he had developed in conducting a similar business before he and Mr. Passmore formed AEE–EMF.

2. Mr. Passmore's relationship with AEE–EMF may be characterized as both former employee and, by analogy, former business partner. He owned fifty percent of the stock and Mr. Spring owned the remaining fifty percent of this small business. Missouri courts have recognized a distinction between covenants ancillary to sale of a business and covenants merely ancillary to an employee contract, showing substantially greater liberality in enforcing the former. *Orthotic & Prosthetic Lab, Inc. v. Pott,* 851 S.W.2d 633, 643 n. 4 (Mo.App.1993) (citing Harold William Hinderer III, *Covenants Not To Compete–Enforceabil-*

*ity Under Missouri Law,* 41 Mo.L.Rev. 37, 44 (1976)). "The essence of the distinction between covenants in employment contacts and those accompanying the sale of a business is the effect of the restraint on the covenantor. In the former there is seldom equal bargaining power between the employee and the employer." Harold William Hinderer III, *Covenants Not To Compete–Enforceability Under Missouri Law,* 41 Mo.L.Rev. at 39. Mr. Passmore was not in an unequal bargaining position when he contracted with Mr. Spring for a covenant not to compete which was adopted by both men in their written agreement.

(b)

■ Mr. Passmore next claims that AEE–EMF had no protectable trade secrets warranting five year noncompetition restriction. In determining the reasonableness of a covenant not to compete, the employer's need to protect legitimate business interests such as trade secrets is examined. *Grebing v. First Nat. Bank,* 613 S.W.2d 872, 874 (Mo. App.1981). The employer has "the burden of proof ... to substantiate its asserted interest in [a] trade secret as defined in the Restatement of Torts." *Mo–Kan Cent. Recovery Co. v. Hedenkamp,* 671 S.W.2d at 400. Whether the data sheets and the price list are trade secrets does not affect AEE–EMF's entitlement to enforce the noncompetition clause because AEE–EMF's customer contacts are a protectable interest. However, analysis of whether the data sheets and the price list are trade secrets and their importance to AEE–EMF, even if they are not, are part of the circumstances that may be considered in determining the reasonableness of the length of time the noncompete restriction is imposed because they are the apparent property of the company and essential to the company's competitive performance.

The data sheets are company owned documents that systematically diagram and articulate the contents and structure of electronic aircraft parts and a sequential procedure for restoring them to functional state. Approximately twenty to thirty data sheets were contributed by the parties when the company was founded, and about 730 to 800 were created by the company in preparation of repairing defective parts received from customers during the company's existence. The data sheets are reviewed by technicians while they repair aircraft electrical components and constitute the "map" for repairing and rebuilding such components.

While the data sheets may not have been essential to repair electronic aircraft parts, they were important. The data sheets facilitated more rapid repair and permitted the company to be competitive within the industry. Multiple copies of the work sheets were kept away from the business by the parties to ensure that the company would have accessible data sheets should those kept at the place of business be destroyed.

As important to the business as the data sheets were, the company did not treat them as secrets. For example, the company did not require employees to sign nondisclosure statements, keep the data sheets in a restricted area, utilize control measures for an employee to obtain and use needed data sheets, or preclude copies from being made and removed from the company's place of business. Additionally, when airline customers requested copies of data sheets utilized to repair a part provided by the customer, the company sent the data sheet requested and did not require that dissemination of the data sheet be restricted or that the data sheet be treated by the airline as confidential.

Although a few data sheets were brought to the company when it was formed by Mr. Spring and Mr. Passmore, most of the data sheets were the product of the company's experienced technicians examining an electronic part to be repaired and meticulously drafting the step-by-step sequential process for repairing the part as they disassembled and reassembled it. Diagrams were frequently drafted by the technician as a part of a data sheet. The data acquired and the memorialized procedure of repair to be utilized became the data sheet for repairing the part. Subsequent repair of like parts permitted the repairing technician to utilize the appropriate data sheet previously prepared thereby saving considerable time, effort, and money, making the company more competitive. Apparently, all F.A.A. approved technicians were capable of preparing the data sheets.

Trade secrets are defined in Restatement of Torts (1939), § 757 as follows:

b. Definition of trade secret. A trade secret may consist of any formula, pattern, device or *compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.* It may be a formula for a chemical compound, a process of manufacturing ... materials, a pattern for a machine or other device, or list of customers.... [I]t is not simply information as

to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods, as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or the other operations in the business, such as a code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

Secrecy. *The subject matter of a trade secret must be secret.* Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.... Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved in its use.... Nevertheless, *a substantial element of secrecy must exist, so that, except by use of improper means, there would be difficulty in acquiring the information. An exact definition of a trade secret is not possible. Some factors to be considered in determining whether given information is one's trade secret are: (1) the extent which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be prop-*

erly acquired or duplicated by others. (Emphasis added.)

*Mo–Kan Cent. Recovery Co. v. Hedenkamp,* 671 S.W.2d at 399–400. Thus, a trade secret "is any formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." *Steamatic of Kansas City, Inc. v. Rhea,* 763 S.W.2d 190, 194 (Mo.App.1988). However, RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 (1995) states that secrecy need not be absolute. "[O]nly secrecy sufficient to confer an actual or potential economic advantage on one who possesses the information" is sufficient. *Id.* at 431. The secrecy requirement "is satisfied if it would be difficult or costly for others who could exploit the information to acquire it without resort to ... wrongful conduct.... Novelty in the patent law sense is not required." *Id.*

██ While the data sheets may have constituted a process for the "continuous use in the operation of the business" and were important to the company's business, they contained information that was general knowledge in the industry, acquirable by any licensed F.A.A. technician.[3] The subject matter of a trade secret must be secret. Matters of general knowledge in an industry cannot be appropriated by one as his secret.

Whether the data sheets are trade secrets is a close question that need not be decided here because AEE–EMF has a protectable interest in its customer contacts. However, the data sheets were essential to the company's day-to-day business and are the company's property. The detrimental effects of their use by AE and Mr. Passmore as competitors can, therefore, be considered when addressing the reasonableness of the non-competition covenant.

██ AEE–EMF also argues that its price list was a trade secret. Only the com-

---

**3.** RESTATEMENT (THIRD) OF UNFAIR COMPETITION notes, "The prior Restatement of this topic limited the subject matter of trade secret law to information capable of 'continuous use in the operation of a business.'" *Id.* at 429. The definition of trade secret in RESTATEMENT (THIRD) OF UNFAIR COMPETITION does not include the phrase.

pany's officers and one employee were authorized to access the company's price list. The price lists were prepared after determining the productivity of employees in restoring parts for customers. Productivity included the length of time technicians required to reconstitute parts. Use of data sheets affected the time required by technicians to repair parts and affected the prices charged airline customers.

Mr. Passmore obtained the company's price list from the company's trash and not the company's files. While discarding the price list, or a portion of it, in the trash without shredding it or otherwise destroying it may have been careless and inconsistent with the company's asserted intent to keep secret the prices it charged customers, this act by itself does not justify a finding that the price list was not confidential. Prices charged for the repair of aircraft electronic parts were affected by the time required to repair parts. Data sheets used to repair parts reduced the time required to repair parts, and affected prices charged. The majority of the company's customers were repeat customers. The company's price list was not provided to customers, although, of course, the company charged its customers a price reflected on the price list for each job performed.

Mr. Passmore utilized the price list he acquired from AEE–EMF to formulate AE's price list, saying that AE's price list is a "revised list of AEE–EMF." Mr. Passmore was a principal owner and his day-to-day involvement with the business certainly gave him knowledge of the manner in which prices were determined for work performed. Acquisition of the company's price list may have made formation of AE's price list easier, but a reasonable conclusion is that Mr. Passmore, because of his experience, knowledge, and the possession of the data sheets, would have prepared a similar or duplicate price list for AE without the benefit of AEE–EMF's price list. Although AEE–EMF may have guarded disclosure of its price list better than it did its data sheets, its price list was not a trade secret.

■ Although AEE–EMF claims in this point on appeal that its customer list constitutes a trade secret, omission of discussion of this claim in its argument abandons this claim. *Saunders–Thalden & Assoc., Inc. v. Thomas Berkeley Consulting Engineer, Inc.,* 825 S.W.2d 385, 387 (Mo.App.1992).

(c)

■ The next issue asserted by the appellants is whether the limitations imposed by the trial court's injunction restricting them from repairing aircraft electrical parts within the United States for five years are necessary to protect AEE–EMF's interests.[4] Restrictions of this type are analyzed to determine whether such time and geographic restrictions are reasonably necessary to protect the interests of the protectee. *Schnucks Twenty–Five, Inc. v. Bettendorf,* 595 S.W.2d 279, 285 (Mo.App.1979). "The time restraint may not exceed that period during which the covenantee's goodwill is subject to appropriation by the covenantor. The reasonableness of a time limitation depends upon the length of this 'vulnerable period.'" Harold William Hinderer III, *Covenants Not To Compete–Enforceability Under Missouri Law,* 41 Mo. L.Rev. at 43.

The case of *Superior Gearbox Co. v. Edwards,* 869 S.W.2d 239 (Mo.App.1993), has many similarities to this case and provides assistance in considering the reasonableness of the five year noncompete restriction imposed by the trial court in this case. In *Edwards,* the Southern District affirmed enforcement of a noncompetition agreement against a former employee (former President and Chief Executive Officer) of a gearbox manufacturer. *Id.* at 242. The court said that when assessing whether a written covenant restricting a former employee's right to compete is reasonable, consideration is given to "the circumstances surrounding the covenant, including its subject matter, the purpose it serves, the situation of the parties, the limits of the restraint, and the specialization of the business involved." *Id.* at 247. The court recognized that, as the reviewing court, if the restrictions imposed by the trial court were determined by it to be unreason-

---

4. The appellants do not raise as an issue the   geographic restriction.

ably broad, the court could modify those restrictions. *Id.* Noting that the former employee for many years had close contacts with employer's customers all over the United States, the court affirmed the trial court's issuing its broad injunction against the former employee from engaging in the business of gearboxes and related products within the United States. *Id.* at 248. However, the court found that the trial court's ten year restriction against competition was unreasonably long, observing that no Missouri cases hold that a ten year restraint is "reasonable against a terminated employee-at-will employee." *Id.* The court noted that the employee had a stake in the success of the employer, was intimately involved with the day-to-day operation of the business, and exercised considerable control as an executive and stockholder. *Id.* The court recognized that the employee "embodied [employer] in the eyes of the company's customers," determining that employee's status during negotiations with employer before accepting employment "was far different from the typical sales person ... who signs (and is required to honor) a [noncompete] covenant of one, two, or three years." *Id.* However, unlike this case, the court also noted that employee was not in a position to demand as much consideration for his promise not to compete as would the typical seller of a business. *Id.* at 248–49. Finally, the court determined that because employee's influence had waned, and because a longer injunction would not protect employer, injunction against employee should be limited to five years, measured from the date of employee's dismissal. *Id.* at 249.

Like the employee and stockholder in *Edwards*, who was President and Chief Executive Officer of employer, Mr. Passmore, as a founder and fifty percent shareholder of AEE–EMF, was significant in the administration and conduct of business in behalf of AEE–EMF. His involvement in his new competing business and his contact with AEE–EMF's customers in behalf of his new enterprise create unfair competition for AEE–EMF for which the company is entitled to the protection of the bargained noncompetition agreement. His use of AEE–EMF's data sheets, although acquirable with expenditure of time and effort by his technician employees over a period, make his new company, AE, immediately competitive and able to obtain business utilizing AEE–EMF's customer contacts and good will. However, considering the nature of the business and the attendant circumstances, the five year noncompete restriction imposed on Mr. Passmore and his new company by the covenant unfairly exceeds the time reasonably necessary to protect AEE–EMF from competition posed by Mr. Passmore. Because the length of time imposed by the covenant not to compete is unreasonably long, the length of the noncompete agreement is reduced to three years from the date Mr. Passmore terminated his employment with AEE–EMF, November 2, 1993.[5] Therefore, the permanent injunction enforcing the noncompete covenant is modified accordingly to three years from November 2, 1993.

As modified, substantial evidence supports the judgment of the trial court, the judgment is not against the weight of the evidence, and it neither erroneously declares nor erroneously applies the law. *Murphy v. Carron,* 536 S.W.2d at 32. The judgment of the trial court is affirmed as modified.

All Concur.

---

5. In *Superior Gearbox Co. v. Edwards,* 869 S.W.2d 239 (Mo.App.1993), the Southern District stated:

> Aside from [*Southwest Pump & Machinery Co. v. Forslund,* 225 Mo.App. 262, 29 S.W.2d 165 (1930)], in every other discovered Missouri case in which an injunction was imposed (either by a trial court or a reviewing court), the

injunction period has begun on the date the defendant resigned or was terminated. This has been the practice even in cases like *Willman v. Beheler,* [499 S.W.2d 770 (Mo.1973)], in which the injunction period had already expired, or nearly so, by the time the reviewing court made its ruling.

*Id.* at 246.