RENAL TREATMENT CENTERS—MISSOURI, INC., Plaintiff/Appellant,

v.

Frank W. BRAXTON, M.D., Defendant/Respondent.

No. 71253.

Missouri Court of Appeals,
Eastern District,
Division Four.

April 8, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 14, 1997.

Application to Transfer Denied
June 17, 1997.

W. Mark Millineaux, Paul D. Cataldo, Duane, Morris & Heckscher, Wayne, for plaintiff/appellant.

John L. Oliver, Jr., Oliver, Oliver & Walz, P.C., Cape Girardeau, for defendant/respondent.

SIMON, Judge.

Renal Treatment Centers–Missouri, Inc. (RTC) appeals from a denial of its petition for temporary injunction, injunctive relief and the granting of partial summary judgment in favor of Frank W. Braxton, M.D. (Braxton).

On appeal RTC contends that the trial court erred in entering judgment for Braxton on the grounds that: (1) RTC failed to prove a protectable interest in its patient contacts because a) Missouri law does not require proof of protectable interests, in that Braxton was an independent contractor rather than an employee and b) RTC established a protectable interest in patient contacts, in that Braxton is the personal physician for virtually all of the patients in question; (2) there was no evidence of unfair competition because Missouri law does not require such proof in this action; (3) RTC failed to establish separate consideration for the non compete clause because a) Missouri law does not require proof of separate consideration, in that Braxton is an independent contractor rather than an employee, b) the covenant not to compete is enforceable based on the consideration Braxton receives for the 1992 final agreement and c) Braxton is estopped from challenging the non compete on this basis in that he accepted all benefits of the contract and is therefore bound to its burdens; (4) RTC had anticipatorily breached its contract to give him an equity interest because a) RTC was not obliged to give Braxton an equity interest in that the 1992 final agreement superseded the 1991 agreement and imposed no such obligation, b) the 1991 agreement with respect to an equity interest was unenforceable in that it was merely an agreement to agree, c) RTC did not manifest a positive intention not to perform and d) Braxton is estopped from challenging the non compete in that he accepted all benefits of the contract and is therefore bound to its burdens and (5) the 1991 agreement did not prohibit Braxton from owning or operating a dialysis facility because a) the 1991 agreement is irrelevant to this case, in that the 1992 final agreement superseded it and did prohibit Braxton from owning or operating a dialysis facility and b) Braxton has admitted that the 1992 agreement did prohibit him from owning or operating a dialysis facility. Finally, RTC contends the trial court erred in granting partial summary judgment for Braxton regarding the Jackson facility because RTC made a submissible case to enforce the non compete clause at that facility in that it presented uncontradicted evidence that Braxton was participating in and assisting at the facility. We affirm.

The record indicates that RTC, a Missouri corporation, owns and operates hemodialysis facilities, dialysis treatment centers, in Cape Girardeau, Poplar Bluff, and Kennett, Missouri. It is a successor corporation to several corporations formerly owned by Robert Falk (Falk). Braxton is a Missouri physician, certified as a nephrologist, and treats patients with kidney disease.

Braxton came to Cape Girardeau as an employee of the Internal Medicine Group (IMG). Subsequent to Braxton's arrival, Falk came to Cape Girardeau in order to establish a dialysis treatment center and later expanded his business by opening a treatment center in Poplar Bluff. Falk contacted IMG and requested that it provide a director for his two facilities. An agreement was reached and Braxton served as medical director for Falk's two facilities through his contract with IMG.

In addition to his employment with IMG, Braxton supplemented his income by working in the emergency room at Twin Rivers Regional Medical Center (Twin Rivers) in Kennett, Missouri. During the time of his employment at Twin Rivers, it decided that it needed a dialysis unit, established such a unit and hired Braxton as medical director.

In 1991 Braxton separated from IMG and accepted identical contracts from Falk to be the medical director of the Cape Girardeau and Poplar Bluff facilities. The contracts differed only by location of the facility.

After signing the contracts, Braxton realized that they contained language the parties had not orally agreed to. Braxton instructed an attorney to communicate with Falk about the disparities. The contentions concerned the binding effect of the contract and the

scope and meaning of the covenant not to compete. Paragraph 6(b) states:

During the term of this Agreement and for a period of two (2) years thereafter, Medical Director and all Physicians affiliated with Medical Director, will not engage, directly or indirectly, either as principal, agent, proprietor, shareholder, director, officer or employee or participatant in ownership, management, operation or control of any hemodialysis facility within a ... 75 mile radius of the CENTERS, with the exception of the Kennett, Missouri dialysis facility or if mutually agreed by both parties.

The language of the contracts created two circles, each with a 75 mile radius. One had Cape Girardeau at its center and the other, Poplar Bluff. The contracts also made clear that they only related to Braxton's role as a medical director and were not to interfere with or impede his "ability to practice medicine." Each of the contracts had identical non compete language.

Because of Braxton's complaints concerning the ambiguities in paragraph 6(b) and its two-year post-termination application, Falk and Braxton agreed to amend paragraph 6(b) and specifically state what conduct and acts were intended to be prohibited. The amendment provided:

1) Clarification Paragraph 6, Section (b):

The purpose of this paragraph section (b) is to preclude [Braxton] from contracting with another dialysis units [sic] for any form of reimbursement/profit that adversely affects the operations of the CENTERS.

In the Fall of 1992, Falk purchased the dialysis unit in Kennett from Twin Rivers. Shortly thereafter, Falk offered Braxton a new contract making him the medical director of all three facilities. The new contract did not contain the "Kennett exception." Braxton refused to sign the contract. As a result, the parties executed one unitary contract covering all three facilities dated September 1, 1992. Paragraph 6(b), creating the two 75 mile circles, and the "Kennett exception" were included in the contract.

In late 1993, Braxton constructed and began to operate his own dialysis facility in Osceola, Arkansas. Osceola is located more than 75 miles from Cape Girardeau and Poplar Bluff but less than 50 miles from Kennett. The opening of the facility occurred in December 1993. Falk did not object to the Osceola unit and has never asserted that Braxton's ownership or operation of the Osceola facility was in violation of the non compete agreement.

Subsequently, following a series of unsuccessful discussions and negotiations by the parties for changes in the contract, Braxton used his interpretation of the "Kennett exception" to open a dialysis center in Kennett, Missouri. To that end, he purchased real estate in Kennett and began construction.

Meanwhile, in 1995 in Jackson, Missouri, Dr. Ramiro Icaza (Icaza) decided to expand his ventures by opening a dialysis center in Jackson and he began to build a facility. It was to be incorporated as Cape County Dialysis Center, Inc. (the Jackson facility). Icaza hired Dr. Kira Stern to be the medical director of the facility. Icaza had an open house for his facility in which there was a ribbon cutting ceremony. Numerous persons were invited to attend including Braxton and Stern. A newspaper photo was taken of the ribbon cutting where Braxton was pictured. He was identified only as an M.D.

In its two count petition, RTC sought to enjoin Braxton from opening a kidney dialysis center in Kennett and alleged that he was in violation of the non compete clause due to his activities with the Jackson facility.

In seeking to enjoin Braxton from opening a dialysis center in Kennett, RTC alleged that the medical director's agreement prohibited Braxton from operating a dialysis center within a 75 mile radius of Cape Girardeau or Poplar Bluff and that Kennett falls within the restricted area designated in the non compete clause. RTC contended that the "Kennett exception" only allowed Braxton to work at the Twin Rivers dialysis center located in Kennett, Missouri.

In addition, RTC alleged that Braxton was involved improperly with the operation of the Jackson facility because he was participating in the management and control of the facility

in violation of the parties' non compete clause.

Braxton filed a motion to dismiss RTC's petition. The trial court denied Braxton's motion and RTC amended its petition. The amended petition essentially restated the allegations and additionally alleged that the non compete clause prohibited Braxton from owning and operating a dialysis center anywhere in the city of Kennett.

Braxton moved to dismiss RTC's amended petition for failure to state a claim upon which relief may be granted and to plead separate consideration for the covenant not to compete. Further responding, Braxton denied that the covenant prevented him from owning a dialysis facility in Kennett and alleged that the covenant only prohibited him from contracting with another facility in Kennett as a medical director.

Later, RTC filed a motion for temporary injunction seeking to prohibit Braxton from opening his dialysis facility in Kennett during litigation. The trial court set a hearing on the injunctive relief as to the Kennett facility only.

Falk, testifying for RTC, related the origin of RTC, the agreements between RTC and Braxton, the intent behind the agreement and Falk's interpretation of the parties' understanding of the "Kennett exception." Falk testified that originally RTC had no ownership interest in the Twin Rivers dialysis center, of which Braxton served as medical director before RTC purchased it. He stated that when the parties signed the agreements for the Cape Girardeau and Poplar Bluff facilities, the exception was included to allow Braxton to remain the medical director at Twin Rivers.

On cross-examination Falk testified as to the process a patient goes through when receiving dialysis treatment. The process begins when a physician diagnoses kidney disease. The patient's initial treatment should originate at a hospital and maintenance should follow at a dialysis center. Then the patient selects which center he wishes to attend and the doctor writes an appropriate prescription. Falk also stated

that Braxton's role as a medical director is set by federal regulations which provide:

> (b) Standard: responsibilities. The responsibilities of the physician-director include but are not limited to the following:
>
> (1) Participating in the selection of a suitable treatment modality, i.e. transplantation or dialysis, and dialysis setting, for all patients;
>
> (2) Assuring adequate training of nurses and technicians in dialysis techniques;
>
> (3) Assuring adequate monitoring of the patient and the dialysis process, including, for self-dialysis patients, assuring periodic assessment of patient performance of dialysis tasks;
>
> (4) Assuring the development and availability of a patient care policy and procedures manual and its implementation. . . .

Reg. Sec. 405.2161 par. 20,866Y. Moreover, Falk testified that a medical director has no "hands-on" patient contacts and that patient care is provided by a patient's physician or employee nurses. Further, that a medical director functions in accordance with the federal requirements and his responsibilities are the same regardless of the facility.

Braxton testified as to his role as physician and how it differs from his role as medical director. As a physician he diagnoses kidney disease and provides care and treatment for patients. Further, he writes prescriptions for his patients for medication and follow-up maintenance dialysis treatments.

As medical director his job includes ensuring that the staff is trained, checking patient care plans and overseeing the "medical operation of a renal dialysis unit." However, he stated that as medical director he had no patient contact and had nothing to do with the business side of the facility. He stated that medical directors are fungible and that a patient would never know if the position was held by one person or another. He stated that as medical director he learned nothing secret, special or different from working at RTC's facilities. In addition, he testified as to his understanding of the "Kennett exception," and that he refused to sign any contract which lacked the exception because he

did not want to be restricted in any way in Kennett.

RTC filed its post-hearing brief in support of temporary injunction. RTC argued that Braxton is not free to open up a facility in Kennett under the 1992 agreement and that the covenant not to compete is reasonable in its scope and duration. Further, RTC contended that it has a protectable interest in its customer contacts and that the clause is supported by consideration.

In his post-hearing reply brief, Braxton alleged that RTC failed to show that it had a legally sufficient protectable interest and that his first contact with patients is as a physician, not as medical director. Further, Braxton contended that RTC failed to allege that he, as medical director, had patient contacts prior to his relationship with the patients as physician.

In response, RTC contended that Missouri law allows for enforcement of a covenant not to compete against him when he has customer contacts, regardless of how the contacts were established.

The trial court entered an order prohibiting Braxton from treating patients in his Kennett facility, except for patient "X," until the court reached a decision on RTC's petition for injunction. "X" was treated for the purpose of calibrating machines and equipment and to assist in the training of the staff.

Subsequent to the hearing, Braxton moved for partial summary judgment on the issues involving the Jackson facility. Braxton contended that he is entitled to a judgment as a matter of law because he is the only nephrologist in the area. Icaza is the owner of 100% of the stock of the Jackson facility and that Braxton does not have any ownership interest of any kind in the facility. In addition, Braxton is not the medical director of the Jackson facility and has not participated in the control or management of the facility. In support of his motion, Braxton filed a memorandum, portions of his deposition and those of Icaza; Kira Stern, the medical director of the Jackson facility; and John Thompson, a bank representative.

In its response to Braxton's motion for partial summary judgment, RTC contended the purpose of the medical director's agreement was to prevent Braxton from participating in the ownership, management, operation or control of any hemodialysis facility within the restricted geographic areas. RTC contended that Braxton has patient contacts as medical director and that it has an interest in the identity of its patients not being shared with competitors. RTC admitted that Braxton has the right to participate in activities at the Jackson facility if he does so as a physician providing services for a patient, but contended that his actions went beyond that. In support of its response, RTC cited portions of depositions previously noted.

Subsequently, RTC filed a cross-motion for summary judgment as to the Jackson facility essentially, pointing to the same facts that Braxton did in his motion for partial summary judgment but arguing that they indicate management and control by Braxton of the Jackson facility. In support of its motion, RTC directed the court to portions of the agreement and the depositions of Icaza; Braxton; Carrie Thorne, an employee of Icaza; and Mary Lou Brown, an employee of Braxton.

Braxton's response to RTC's cross-motion for summary judgment restated the arguments which the parties had made previously and restated that Braxton was entitled to judgment while RTC was not.

Following a hearing on the motions for partial summary judgment, the matter was "taken under advisement." Later, the court denied RTC's motion for partial summary judgment and granted Braxton's motion for partial summary judgment.

The trial court set forth Findings of Facts and Conclusions of Law denying RTC's request for temporary injunction. Among other findings, the trial court held that RTC failed to show a sufficient protectable interest. The court further found that there was no just reason for delay and entered a final judgment against RTC on its claim for injunctive relief as to the Kennett facility.

■ The standard of review as to RTC's points on appeal that are directed to the trial court's denial of the temporary injunction relating to the Kennett facility is set by the

oft cited principles of *Murphy v. Carron,* 536 S.W.2d 30, 32[1] (Mo.1976). Therefore, the judgment of the trial court will be affirmed unless there is no evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* We review the facts and the reasonable inferences therefrom in the light most favorable to the trial court's order. *Id.* We defer to the trial court for a determination of witness credibility. *Reed v. Reberry,* 883 S.W.2d 59, 61 (Mo.App.1994).

■ Following oral argument, RTC, citing Rule 370(b) as authority, filed a ten page document with exhibits A–D attached purporting to advise this court of new developments. Subsequently, Braxton filed a motion to strike the document as it did not comply with the requirements of Rule 370(b). The motion was ordered taken with the case. Eastern District Court of Appeals Special Rule 370, Supplemental Briefs and Supplemental Citations, provides in pertinent part:

(b) Counsel may call the court's attention to intervening decisions or new developments by directing a *short* letter providing the *supplemental citations* to the clerk....

We have reviewed RTC's document and find that it does not comply with our Rule and must be stricken.

In its first point on appeal, RTC contends that the trial court erred in entering judgment for Braxton on the grounds that RTC failed to prove a protectable interest in its patient contacts because Missouri law does not require proof of protectable interests because Braxton is an independent contractor. It also contends that if proof of a protectable interest is required then it did so because Braxton is the personal physician for virtually all of the patients in question.

■ Thus, the threshold issue is whether covenants not to compete apply to an independent contractor. Neither party directs us to, nor does our research reveal a Missouri case in which a covenant not to compete was enforced or not enforced against an independent contractor. Further, our research does not reveal an applicable statute.

■ An agreement by a person to refrain from exercising his trade or calling, standing alone, is viewed as being illegal and contrary to public policy because it is against the interests of society in a free competitive market and to the interests of the person refrained in earning a livelihood. John D. Calamari & Joseph Perillo, *Contracts,* Specific Performance, sections 16–19 (1977). However, if a covenant not to compete forms part of a legitimate transaction, a different problem is presented. *Id.* Such a covenant is often described as an "ancillary restraint" to indicate its connection with a legitimate transaction. Such ancillary restraints may be valid if they are reasonable in scope and duration. *Id.; AEE–EMF, Inc. v. Passmore,* 906 S.W.2d 714, 719[4–10] (Mo.App. W.D.1995). Non compete agreements emanate from the purpose of protecting a business entity from unfair competition by a former business associate without imposing unreasonable restraints on the latter. *Id.* at 720.

■ Promises imposing restraints that are ancillary to a valid transaction or relationship include the employer-employee and buyer-seller relationships and partners against partnerships. *See Osage Glass, Inc. v. Donovan,* 693 S.W.2d 71, 74 (Mo. banc 1985); *Refrigeration Indus., Inc. v. Nemmers,* 880 S.W.2d 912, 921 (Mo.App.1994); Restatement (Second) of Contracts § 188 (1979). However, as noted in the Restatement, this is not an exclusive list. *Id.* There may be other situations in which a "valid transaction or relationship would give a promisee legitimate interest sufficient to sustain a promise not to compete." *Id.*

In reviewing decisions of other jurisdictions, we find that non compete covenants are applicable to an independent contractor relationship. In *Amstell, Inc. v. Bunge Corp.,* 213 Ga.App. 115, 443 S.E.2d 706, 707 (1994), the terms of the covenant not to compete were ancillary to an independent contractor agreement. The court held that the agreement would be treated as an employment contract and that in order for the non compete to be enforceable it must be limited in time and territorial effect and otherwise reasonable. *Id.* The court held that

because the non compete clause lacked territorial limitations the covenant was invalid. *Id.*

In *Starkings Court Reporting Serv. v. Collins,* 67 N.C.App. 540, 313 S.E.2d 614, 616 (1984), the court held that covenants not to compete are applicable to the independent contractor relationship. The court found that the covenant was an unreasonable restraint on trade because it provided for greater restraint than is reasonably required for the protection of the owner.

Here, RTC and Braxton entered into a contract whose validity is not in dispute, for the purpose of employing Braxton as medical director for RTC's facilities. RTC seeks to be protected from competition by Braxton and a non compete clause was included in the agreement. Clearly this agreement is one of employment. Therefore, the non compete clause is ancillary to a valid employment agreement and it is reasonable to conclude that the non compete provision could apply to Braxton as an independent contractor.

 However, non compete agreements are not favored in the law. *AEE–EMF,* 906 S.W.2d at 719. In employment situations, Missouri requires that a party seeking to enforce a non compete clause prove that it has a protectable interest. *Id.* Two such protectable interests have been identified as customer contacts and trade secrets. *Id.* Here, the purpose of the non compete clause is to protect certain interests of RTC.

 RTC contends that it established a protectable interest in its patient contacts because Braxton is the personal physician for virtually all of the patients in question. Braxton contends that RTC has no interest in his contacts with his patients as their private physician and that since he has no patient contacts as medical director, RTC has no protectable interest as to Braxton.

RTC, relying on *AEE–EMF,* contends that the patient contacts its seeks to protect may predate the patient's actual attendance at the dialysis centers. 906 S.W.2d at 720. *AEE–EMF* involved two presidents of corporations which entered into an agreement to form a new corporation. The non compete clause within the agreement provided that the party wishing to leave the newly formed company would not compete with it for a period of five years from the date of separation. Each party contributed their customer contacts which were developed prior to the formation of the new corporation. *Id.* Plaintiff wished to separate from the new company and compete against it. The Western District found that the customer contacts plaintiff had developed prior to the new corporation's formation were a protectable interest of the new corporation.

However, RTC's reliance on *AEE–EMF* is misplaced. Here, it is important to examine Braxton's two roles. We must examine the relationship Braxton has with his patients and what, if any, relationship he developed as medical director. As a physician, Braxton meets with his patients, examines them and makes a diagnosis. He determines if dialysis is needed and the frequency of the treatment. The patient chooses a facility from which to receive maintenance and the physician writes an appropriate prescription. He monitors their progress and determines what, if any, other treatment is needed.

As medical director, Braxton's duties are set forth by federal regulations. Such duties are supervisory in nature and do not involve face-to-face patient contact. Further, "hands-on" patient care is provided at the facility by employee nurses or the patient's private physician. Medical directors do not provide "hands-on" patient care.

Braxton was to perform the function of medical director under the contract which identified his responsibilities as those required by federal regulations including; participating in the selection of a suitable treatment modality, assuring adequate training of staff, assuring adequate monitoring of the patient and the dialysis process, and developing patient care policies. Braxton was remunerated for his regulatorily defined functions, not for the number of patients he referred to the facility. As medical director, Braxton has no "hands on" patient contacts.

RTC has no interest in Braxton's contacts with his patients in his capacity as their private physician. In addition, since Braxton has no patient contacts as medical director,

RTC did not prove a protectable interest in its patient contacts as to Braxton. The disposition of RTC's first point also disposes of the point directed to the partial summary judgment as to the Jackson facility and RTC's other points on appeal.

Judgment affirmed.

RHODES RUSSELL and KAROHL, JJ., concur.