# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 09-2061

———————

Mayer Hoffman McCann, P.C.,     *

             Appellee,     *

      *   Appeal from the United States

      v.              *   District Court for the Western

      *   District of Missouri.

Thomas L. Barton; Anthony W. Krier;     *

James N. Stelzer; John C. Walter,     *

      *

             Appellants.     *

———————

Submitted: January 13, 2010
Filed: August 11, 2010

———————

Before GRUENDER and SHEPHERD, Circuit Judges, and JARVEY,[1] District Judge.

———————

SHEPHERD, Circuit Judge.

Mayer Hoffman McCann, P.C. ("MHM"), a professional corporation organized in Missouri, is a national certified public accounting (CPA) firm. MHM sued its former employees[2] and shareholders—Thomas L. Barton, Anthony W. Krier, James

---

[1]The Honorable John A. Jarvey, United States District Judge for the Southern District of Iowa, sitting by designation.

[2]Although appellants dispute that they were MHM employees, they were at least at will employees of MHM pursuant to their own contractual agreements with MHM.

N. Stelzer, and John C. Walter (collectively, "appellants"), all CPAs licensed by the State of Minnesota—to enforce restrictive covenants contained in contractual agreements between the appellants and MHM. Following a bench trial, the district court[3] granted judgment to MHM, awarding MHM permanent injunctive relief and $1,369,921 in liquidated damages. Appellants bring this appeal, contending that: (1) enforcement of the restrictive covenants is contrary to Missouri law and (2) even if the restrictive covenants are enforceable, the liquidated damages provision is void and unenforceable under Missouri law. We reject these contentions and affirm the judgment of the district court.

I.

From at least 1998 until August 15, 2005, appellants, along with CPA Tim Talbott, were employees and shareholders of Bertram, Vallez, Kaplan & Talbot ("Bertram Vallez"), a CPA firm located in New Hope, Minnesota. In August 1998, Bertram Vallez entered into an Administrative Services Agreement with a predecessor to CBIZ, Inc. ("CBIZ"),[4] a public company that provides various financial services, including some accounting services; employee services; and technology solutions. Pursuant to the agreement, Bertram Vallez and CBIZ agreed to operate under the Alternative Practice Structure model ("APS").[5] Bertram Vallez provided attest

---

[3]The Honorable Gary A. Fenner, United States District Judge for the Western District of Missouri.

[4]Various subsidiaries of CBIZ, Inc. were associated with Bertram Vallez as well as MHM. For ease of discussion, we collectively refer to these entities as "CBIZ."

[5]In general, an APS is an accounting firm

divided into two separate entities, a professional corporation and a business corporation, separating the attest function activities from the business services (such as consulting, financial planning, tax compliance and planning, and other business advisory services). . . . The accounting

services[6] to clients, and CBIZ (1) performed nonattest services[7] for clients and (2) provided Bertram Vallez with "a variety of management advisory and business-related services," including "certain administrative, personnel, marketing, and other support services." (Appellants' App. 165.) In exchange for CBIZ's provision of administrative services, Bertram Vallez agreed to pay 85% of its revenues to CBIZ. Also in August 1998, Barton executed an Executive Employment Agreement with CBIZ. Krier, Stelzer, and Walter entered into confidentiality and nonsolicitation agreements with CBIZ ("Confidentiality Agreements") on December 31, 2003, August 17, 2003, and January 30, 2004, respectively.

In 2004, Bertram Vallez met with William Hancock, the president of MHM. At that time, MHM and CBIZ operated under an APS. The parties discussed Bertram Vallez joining MHM's New Hope office. In additional discussions with CBIZ

---

firm (professional corporation) performs all attest functions, including audits, reviews and compilations. It is 100% owned by certified public accountants and is managed by a "managing member," who is also a CPA. The owners of the CPA firm are employees of the CPA firm (as well as the business services company) and the rest of the personnel are employees of the business services company. There is a long-term administrative services agreement between the two, stipulating that support and personnel staff are made available to the CPA firm by the business services company. The latter also provides office space, equipment and recordkeeping for the CPA firm.

James D. Campbell, Alternative Practice Structures, Penn. CPA J. 10, 10-11 (Winter 1999).

[6]"Attest services are required to be performed by a licensed CPA or licensed CPA firm." (Trial Tr. vol. II, 215.) In most states, this includes audits and reviews. (See id.)

[7]Nonattest services do not require a CPA and include "tax work and consulting services." (Trial Tr. vol. II, 215-16.)

management, Bertram Vallez indicated that they did not want to move to MHM's Minneapolis location. There was no binding agreement reached, but Talbot understood that MHM would maintain its New Hope office for a period of at least three years.

On August 15, 2005, four agreements relevant to this appeal were executed: (1) the Termination Agreement between Bertram Vallez and MHM, (2) the Restated Administrative Services Agreement between MHM and CBIZ, (3) the Subscription and Affiliation Agreement between each appellant and MHM, and (4) the Stockholder's Agreement.[8]

Under the Termination Agreement, Bertram Vallez agreed to halt its accounting practice in exchange for MHM's agreement to provide accounting services to the Bertram Vallez's clients. MHM also agreed to include Bertram Vallez as a predecessor company on its professional liability insurance so that appellants and Talbott continued to receive insurance coverage for acts that occurred during the time they worked for Bertram Vallez.

Pursuant to the Restated Administrative Services Agreement, MHM and CBIZ agreed to continue operating under the APS, with MHM providing attest services and CBIZ performing nonattest services as well as administrative and other support services. In return for CBIZ's provision of administrative services, MHM agreed to pay 85% of its attest revenues to CBIZ.

Under the Subscription and Affiliation Agreement, each appellant purchased 1,000 shares of MHM stock. Per the agreement, each appellant "recognize[d] that [he] may not resell the Shares unless [he] compl[ied] with the terms of the Stockholders

_____

[8]Although each appellant executed a separate Stockholder's Agreement, the agreements are identical such that we collectively refer to all of them as the "Stockholder's Agreement."

-4-

Agreement, and then, the Shares may only be sold to [MHM] or to individuals who are not disqualified under applicable law to be stockholders of [MHM]." (Appellants' App. 40.)

In the Stockholder's Agreement, subject to certain conditions, MHM agreed to repurchase each appellant's shares of MHM stock upon the termination of his employment with MHM. Appellants agreed that for the "Post-Employment Restrictive Period,"[9] a period of two years following the termination of their employment, they would not: (1) solicit, directly or indirectly, or attempt to solicit MHM's clients or otherwise interfere with MHM's relationship with its clients, or (2) solicit MHM's employees. Appellants further agreed not to copy, disseminate, or

---

[9]The Stockholder's Agreement does not specifically define "Post-Employment Restrictive Period" but describes it, as relevant here, as "the post employment period during which the non-competition provision of the Shareholders' Executive Employment Agreement or other contractual arrangements with [CBIZ] applies." (Appellants' Add. 56-57.) The "Restrictive Period" under the Confidentiality Agreements Krier, Stelzer, and Walter had with CBIZ was two years. Thus, their "Post-Employment Restrictive Period" under the Stockholder's Agreement was also two years. The "Restriction Period" in Barton's 1998 Executive Employment Agreement with CBIZ was five years. It follows that Barton's "Post Employment Restrictive Period" under the Stockholder's Agreement would also be five years. However, the district court found "that MHM represented at trial that it would only seek enforcement of Mr. Barton's restrictive covenant for two years and that the logistics of policing the agreement of varying lengths between partners of the same firm warrants enforcement of Barton's covenant for two years rather than five." Mayer Hoffman McCann, P.C. v. Barton, No. 4:08-CV-00574-GAF, 2009 WL 900741, at *4 (W.D. Mo. Apr. 1, 2009) (unpublished). MHM does not challenge this factual finding on appeal and, thus, has waived any argument to the contrary. See Freeman v. Ferguson, 911 F.2d 52, 56 (8th Cir. 1990) ("It is well settled in this circuit if an issue is not raised on appeal it will be deemed abandoned." (quotation omitted)). Therefore, for purposes of this appeal, Barton's "Post-Employment Restrictive Period" was two years.

use MHM's confidential information at any time.  The specific contractual provisions are as follows:

### 5.1   Non-competition.

The Shareholder agrees that during the period in which the Shareholder is employed by [MHM] and during the Post-Employment Restrictive Period the Shareholder shall not, without the prior written consent of [MHM], either directly or indirectly, solicit, attempt to solicit, take away, attempt to take away, or otherwise interfere with [MHM's] relationship with any customer (including any customer in [MHM's] data base) . . . .

### 5.2   Nonsolicitation.

The Shareholder agrees that he shall not at any time (whether during or after the Shareholder's termination of employment with [MHM]), without the prior written consent of [MHM], either directly or indirectly (i) solicit (or attempt to solicit), induce (or attempt to induce), cause or facilitate any employee, director, agent, consultant, independent contractor, representative or associate of [MHM] to terminate his, her[,] or its relationship with [MHM], or (ii) solicit (or attempt to solicit), induce (or attempt to induce), cause [or] facilitate any supplier of services or products to [MHM] to terminate or change his, her[,] or its relationship with [MHM], or otherwise interfere with any relationship between [MHM] and any of [MHM's] suppliers of products or services.

### 5.3   Nondisclosure.

The Shareholder agrees that he shall not at any time (whether during or after the period of his employment with [MHM]) directly or indirectly copy, disseminate or use, for the Shareholder's personal benefit or the benefit of any third party, any Confidential Information, regardless of how such Confidential Information may have been acquired, except for the disclosure of such Confidential Information as

may be (i) in keeping with the performance of the Shareholder's employment duties with [MHM], (ii) as required by law, or (iii) as authorized in writing by [MHM].

(Appellant's Add. 56-57.) The Stockholder's Agreement also provides that it is identical to the stockholders' agreements executed by MHM and all other MHM shareholders and that Missouri law governs the rights and obligations of the parties.

From 2005 to 2007, appellants were employees and shareholders of MHM. Talbot served as both an employee and shareholder of MHM as well as CBIZ's Managing Director of the New Hope office. Appellants had access to a substantial amount of confidential MHM client information.[10] In the fall of 2007, appellants learned that MHM planned to merge its New Hope office into its Minneapolis office.[11] On April 11, 2008, appellants formed Glennco, LLC (which they later renamed Barton, Walter & Krier, LLC ("BWK")) in anticipation of their departure from MHM.

---

[10]The Stockholder's Agreement defines "confidential information" as

> all information or knowledge belonging to, used by, or which is in the possession of [MHM] relating to [MHM's] business, business plans, strategies, pricing, sales methods, customers . . . , technology, programs, finances, costs, employees (including without limitation, the names, addresses or telephone numbers of any employees), employee compensation rates or policies, marketing plans, development plans, computer programs, computer systems, inventions, developments, trade secrets, know how or confidences of [MHM] or [MHM's] business, without regard to whether any of such Confidential Information may be deemed confidential or material to any third party, and [MHM] and the Shareholder hereby stipulate to the confidentiality and materiality of all such Confidential Information.

(Appellants' Add. 57.)

[11]Within a few weeks of appellants' departure, MHM did combine its New Hope office with its Minneapolis office.

In July 2008, appellants prepared a one-page letter addressed "To our valued Clients and Friends," which was dated August 2, 2008 ("Valued Clients letter"). (See Appellants' Appx. 84.) Each appellant had Valued Clients letters for the clients they had worked with at MHM. The Valued Clients letter states that appellants have resigned from MHM and are forming a new firm. (See id.) The Valued Clients letter further states:

> It is my hope that you will join me at our new firm. In order to make the transition at this time I am providing you with a termination letter to end your relationship with CBIZ and an engagement letter to begin a new relationship with [BWK]. **It is imperative that we receive these letters back <u>as soon as possible</u>.**

(<u>Id.</u>) The Valued Clients letter also requests that clients "not contact CBIZ to discuss this matter." (<u>Id.</u>)

On Friday, August 1, 2008, appellants left resignation letters on Talbott's desk which he found on Monday, August 4. Each letter stated that the appellant was resigning his employment with MHM effective at 5:00 p.m. on August 1, 2008. The letter further provided that the appellant was tendering his MHM shares for purchase by MHM as provided for in the Stockholder's Agreement.[12] Appellants sent identical letters to Hancock for delivery on August 4.

From August 2 through August 6, 2008, appellants personally called on MHM clients and provided them with the Valued Clients letter, engagement letter, and the termination letter. The appellants also emailed or faxed the letters to other MHM clients, having obtained email addresses and fax numbers from MHM's email

---

[12]MHM has (1) made a down payment on the amount owed and (2) executed notes payable to each of the appellants for the remainder to be paid as provided by the Stockholder's Agreement.

contacts. In addition, appellants successfully recruited four MHM employees to go to work for BWK.

On August 7, 2008, MHM filed this lawsuit in the Circuit Court of Jackson County, Missouri, alleging that appellants breached the Stockholder's Agreement by: (1) soliciting MHM customers (Count I); (2) soliciting MHM employees (Count II); and (3) using and disclosing MHM's confidential information (Count III).[13] The state court granted MHM's request for a temporary restraining order (TRO) that same day, enjoining appellants from: (1) soliciting MHM's customers and employees and (2) using trade secrets or confidential information obtained from MHM. The state court also ordered appellants to return all of MHM's trade secrets and confidential information.[14] Following the entry of the TRO, BWK computers and devices, as well as the BWK server, contained MHM confidential information in documents and emails.[15] In addition, MHM Caseware[16] files were saved to the BWK server as late as September 9, 2008.

On August 11, 2008, appellants removed this action to federal court. After an evidentiary hearing on September 2, 2008, the district court entered a preliminary

---

[13]The complaint also alleged a Count IV, but, as MHM has not pursued it, we do not address it. See Barton, 2009 WL 900741, at *14 n.3.

[14]Pursuant to the Stockholder's Agreement, appellants agreed that, upon their termination, they would (1) "return promptly to [MHM] all memoranda, notes, records, reports, manuals, pricing lists, prints and other documents (and all copies thereof) relating to [MHM's] business . . . regardless [of] whether any such documents constitute Confidential Information" and (2) "forward to [MHM] all Confidential Information," including such information acquired after their termination. (Appellants' Add. 58.)

[15]This was revealed by a computer forensic search after this litigation began.

[16]To manage its files, MHM uses "Caseware," a commercial software product that has been tailored considerably for MHM.

injunction, enjoining appellants from: (1) soliciting, directly or indirectly, or attempting to solicit MHM's clients and employees; (2) seeking to perform any additional attest services for MHM clients; and (3) using trade secrets or confidential information obtained from MHM. The district court also ordered appellants to return MHM's trade secrets and confidential information, retaining no copies for themselves. The court further ordered that "defendants provide immediate access to BWK's computers and servers and the home computers of defendants and their employees for inspection by a computer forensic expert," without "delet[ing] or transfer[ring] any data from these computers until images have been made." (Order Granting Prelim. Inj. 2, Sept. 2, 2008)[17]

The parties filed cross-motions for summary judgment; however, the district court did not rule on the motions. Following a bench trial, the court determined that: (1) the Stockholder's Agreement was supported by sufficient consideration in the form of mutual promises; (2) MHM had a protectable interest in its customer relationships, even though some of its clients were formerly Bertram Vallez's clients; (3) the restrictive covenants in the Stockholder's Agreement are reasonable under Missouri law; and (4) appellants knowingly and intentionally breached the restrictive covenants by soliciting MHM's customers and employees and willfully taking MHM's confidential information.

The court determined that MHM was entitled to liquidated damages because: (1) there was no evidence suggesting the parties intended the provision to be a penalty; (2) the undisputed evidence showed that the damages in this case were difficult to quantify; and (3) the provision was reasonable and binding under the circumstances of this case. The court stated that the agreements "point[] to the

---

[17]Mark Lanterman, Chief Technology Officer for Computer Forensic Services, Inc. ("CFS"), conducted a computer forensic search of BWK's server and computers, applying the search terms agreed upon by the parties, and located approximately 1,500 files and 64,000 emails containing one or more of the search terms.

method of calculation found in the relevant CBIZ agreements to determine liquidated damages[,]" and concluded that "[i]t [was] clear from the circumstances that the Stockholder's Agreement refers to MHM's fees," not CBIZ's fees. Mayer Hoffman McCann P.C. v. Barton, No. 4:08-CV-00574-GAF, 2009 WL 900741, at *21 (W.D. Mo. Apr. 1, 2009) (unpublished). The court observed that "MHM presented evidence" that "[t]he total owed to MHM for [appellants'] breach of the Stockholder's Agreement[] under the liquidated damages provision of the relevant contracts is $1,369,921," MHM's "total billings between August 1, 2006[,] and July 31, 2008[,] [for] clients solicited by [the appellants]." Id. at *22.[18] Because the appellants stipulated that they had each solicited all of the MHM clients and the prospective client included in MHM's liquidated damage-calculation, the court awarded MHM $1,369,921 in liquidated damages and found appellants jointly and severally liable for such damages. The court also granted MHM a permanent injunction, concluding that: (1) MHM had shown irreparable injury in that at least 124 MHM clients had moved their business from MHM to BWK after defendants solicited their business and (2) imposition of such an injunction was not against public policy. The district court denied appellants' motion to alter and amend the findings and judgment. Appellants bring this appeal.

---

[18]From August 1, 2006, through July 31, 2007, MHM's gross fee billings for the solicited clients totaled $692,905. From August 1, 2007, through July 31, 2008, MHM's gross fee billings for the solicited clients totaled $672,859. BWK's billings for one "Qualified Prospective Customer," defined by the Stockholder's Agreement as "any person, organization or other entity to which [MHM] . . . submitted a proposal for attest services at any time during the twelve-month period prior to the termination of [appellants'] employment[,]" (Appellants' Add. 56), were $4,158. We note that, although these amounts total $1,369,922, MHM sought $1,369,921, and the record is silent as to the reason for this one dollar-difference.

## II.

As a threshold matter, we note that appellants largely concede the facts underlying the violations of the restrictive covenants in the Stockholder's Agreement. Rather, the thrust of their appeal is that both the restrictive covenants and the liquidated damages provision are unenforceable under Missouri law. As an appellate court sitting in diversity, we review these questions of Missouri law de novo. See Praetorian Ins. Co. v. Site Inspection, LLC, 604 F.3d 509, 515 (8th Cir. 2010).

## A.

Appellants assert that the restrictive covenants are unenforceable under Missouri law because: (1) there was no consideration given by MHM in exchange for them; (2) they are not ancillary to the requisite type of agreement; (3) MHM does not have the required protectable interest; (4) they are not reasonable in scope; and (5) they aid MHM in its violation of antitrust law. We address each argument in turn.

## 1.

Appellants first argue that the restrictive covenants fail for lack of consideration. Just as with every other kind of contract, a contract containing a restrictive covenant must be supported by consideration. See Sumners v. Serv. Vending Co., 102 S.W.3d 37, 41 (Mo. Ct. App. 2003) ("Consideration . . . is a basic element of a valid contract . . . ."). "The burden of showing legally sufficient consideration rests on the party relying on the contract," here, MHM. Allison v. Agribank, FCB, 949 S.W.2d 182, 188 (Mo. Ct. App. 1997) (per curiam) ("As a general rule, consideration is a necessary element for establishing the existence of a valid contract.").

"Consideration . . . is something of value that moves from one party to the other." Sumners, 102 S.W.3d at 41. More specifically, consideration is

a benefit to the party promising, or a loss or detriment to the party to whom the promise is made. Benefit, as thus employed, means that the promisor has, in return for his promise, acquired some legal right to which he would not otherwise have been entitled, and detriment means that the promisee has, in return for the promise, forborne some legal right which he otherwise would have been entitled to exercise.

Id. (quotation omitted). A bilateral contract, like the Stockholder's Agreement, in which there are "mutual promises imposing some legal duty or liability on each promisor[,] is supported by sufficient consideration to form a valid, enforceable contract." Id.

In Superior Gearbox Co. v. Edwards, 869 S.W.2d 239 (Mo. Ct. App. 1993), the Missouri Court of Appeals enforced a noncompetition covenant in a stock purchase agreement. Id. at 243-49. In the stock purchase agreement at issue there, Superior's employee, Edwards (1) "acknowledged that the milling machinery and procedures developed and used by Superior were unique and were a valuable part of the company's assets," and (2) "agreed that, if he should ever cease to be [a Superior employee], for 10 years thereafter he would not engage in a business anywhere in the United States that manufactures or sells gearboxes or uses plunge milling procedures or technologies." Id. at 243. Per the agreement, Edwards "was to (and did) receive a five percent annual bonus as long as he remained with Superior." Id. Eventually, Edwards left Superior and operated a company in violation of the noncompete clause. Id. Superior brought suit against Edwards for breach of contract. Id. at 241. The trial court granted Superior injunctive relief, enforcing the terms of the noncompete clause. Id. The Missouri Court of Appeals affirmed but reduced the 10-year injunction to 5 years. Id. at 248. However, in enforcing the noncompete clause, the court did not specifically address whether the clause was supported by adequate consideration. See id. at 243-49.

However, in <u>Sturgis Equipment Co. v. Falcon Industries Sales Co.</u>, 930 S.W.2d 14 (Mo. Ct. App. 1996), the Missouri Court of Appeals refused to enforce a restrictive covenant contained in a buy/sell agreement, concluding that it was not supported by adequate consideration. <u>Id.</u> at 17.[19] There, Edwin Johnson, a salesman for Sturgis, executed a buy/sell stock agreement, in which he agreed not to compete with Sturgis for two years following his termination. <u>Id.</u> at 15. In addition, Sturgis obtained a right of first refusal to purchase Johnson's stock and was "bound to purchase any balance remaining unsold at the end of sixty days following . . . Johnson's termination." <u>Id.</u> at 15-16. Eventually, Johnson left Sturgis, without tendering his stock, and formed his own company that competed with Sturgis. <u>Id.</u> at 16. Sturgis brought suit for breach of contract, and the trial court found for Sturgis and awarded him $292,663.97 in damages. <u>Id.</u>

However, the Missouri Court of Appeals reversed, holding, in part, that there was inadequate consideration to support the noncompete clause. <u>Id.</u> at 17. The court explained:

---

[19]"[C]ourts do not [ordinarily] inquire into the adequacy of consideration." Restatement (Second) of Contracts § 79(c); <u>see id.</u> § 79(f) (noting the Restatement's rejection of "any supposed requirement of 'mutuality of obligation'"). Although Missouri has adopted the Restatement approach, <u>see</u> <u>Valentine's, Inc. v. Ngo</u>, 251 S.W.3d 352, 354 (Mo. Ct. App. 2008), <u>see also</u> <u>State ex rel. Vincent v. Schneider</u>, 194 S.W.3d 853, 859 (Mo. 2006) ("As long as the requirement of consideration is met, mutuality of obligation is present, even if one party is more obligated than the other." (quotation omitted)), even recent Missouri cases continue to recite mutuality of obligation as a prerequisite to an enforceable contract, <u>see, e.g.</u>, <u>Birkenmeier v. Keller Biomedical, LLC</u>, No. ED 92671, ___ S.W.3d ___, ___, 2010 WL 1555227, at *9 (Mo. Ct. App. Apr. 20, 2010). We further note that Missouri law provides that "[t]he ordinary rules of contractual construction and enforcement are not necessarily applicable to . . . agreements" containing noncompete clauses. <u>See</u> <u>AEE-EMF, Inc. v. Passmore</u>, 906 S.W.2d 714, 719 (Mo. Ct. App. 1995). Because we are to apply Missouri law, <u>see</u> <u>Praetorian</u>, 604 F.3d at 515, and <u>Sturgis</u> inquires into the adequacy of consideration given by an employer in exchange for an employee's covenant not to compete, <u>see</u> 930 S.W.2d at 17, we do so here.

Here, the buy/sell agreement basically stated that in exchange for Sturgis agreeing to sell stock to Johnson and to buy back Johnson's stock if he desired to sell or if his employment terminated, Johnson agreed to not compete with Sturgis for two years if he voluntarily terminated his employment. The agreement did not state that the purpose of the non-compete clause was to protect any special interest of the company. No additional consideration was specified in the contract. The clause was not part of an employment contract; Johnson was an employee at will. The restriction contained in the buy/sell agreement was greater than fairly required for Sturgis' protection and was not supported by sufficient consideration.

Id.  The Sturgis Court also distinguished Superior Gearbox, stating:

There, as part of that covenant, the Superior shareholders acknowledged that the milling machinery and procedures developed by the company were unique and were a valuable part of the company's assets. Additionally, as part of the same agreement, the shareholders received a five percent annual bonus for remaining with Superior.

Sturgis, 930 S.W.2d at 17.  Therefore, under Superior Gearbox and Sturgis, Missouri law does not provide that a stock purchase agreement containing a noncompete clause can never, as a matter of law, be supported by adequate consideration.  Thus, the question before us is whether the Stockholder's Agreement at issue here is distinguishable from the buy/sell stock agreement in Sturgis.

In the Stockholder's Agreement, appellants promised not to solicit MHM's clients or employees for a period of time following the termination of their employment with MHM and not to, at any time, disclose or use MHM's confidential information.  MHM agreed that it would purchase the appellants' MHM shares within 45 days of the termination of their employment.  The Sturgis court held that the consideration of agreeing to buy back the employee's stock, without more, was

insufficient to support the broad non-compete clause at issue there.[20]  Id.  However, the Sturgis decision recognized the non-compete clause might have been enforced if the stock purchase agreement had provided sufficient consideration such as "state[ing] that the purpose of the non-compete clause was to protect any special interest of the company[, providing] additional consideration[, or being] part of an employment contract."[21]  Id.

As part of the Stockholder's Agreement in this matter, appellants "acknowledge[d] that the restrictions contained in Sections 5.1 through 5.3 are reasonable and necessary to protect the legitimate interests of [MHM]." (Appellant's Add. 58.)  Those legitimate interests were identified in the Stockholder's Agreement and included confidential information or knowledge relating to MHM's "business plans, strategies, pricing, sales methods, customers, . . . technology, programs, finances, costs, employees . . . , employee compensation rates or policies, marketing

[20]Although we are bound to apply Sturgis, see Am. Family Mut. Ins. Co. v. Co Fat Le, 439 F.3d 436, 439 (8th Cir. 2006) ("[W]e are bound in our construction of Missouri law by the decisions of the Missouri courts."), we note that MHM's promise to buy back appellants' stock in MHM was beneficial to appellants.  "Only licensed professionals who are employed by the professional corporation may be shareholders or directors. In addition, shares can only be transferred to other individuals licensed to practice in the same profession." 1A William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 70.10 (perm. ed., rev. ed. 2002).  Thus, there is no ready market for the sale of shares of a professional corporation's stock.  See id. Accordingly, "[i]f a buyback is not provided, a minority shareholder who resigns from or is forced out as an employee of a professional corporation is in a difficult position, absent a protective shareholders' agreement."  1 F. Hodge O'Neal, Robert B. Thompson, & Blake Thompson, O'Neal and Thompson's Close Corporations and LLCs: Law and Practice § 2.9 (rev. 3d ed. 2004).

[21]A later Missouri Court of Appeals decision has explained that "[t]he essence of the [Sturgis] holding is that the evidence did not support a finding of knowledge of trade secrets or of customer contact sufficient to support a restrictive covenant, and so did not justify any kind of restriction."  Alltype Fire Prot. Co. v. Mayfield, 88 S.W.3d 120, 123-24 (Mo. Ct. App. 2002).

-16-

plans, development plans, computer programs, computer systems, inventions, developments, trade secrets, know how or confidences." (Appellant's Add. 57.) Because this Stockholder's Agreement clearly provides that the restrictive covenants are necessary to protect the legitimate interests of the business and identifies those interests, Sturgis does not bar enforcement of the restrictive covenants. See 930 S.W.2d at 17. Furthermore, the restrictions are not "greater than fairly required" for MHM's protection, as was the case in Sturgis. Id. Accordingly, we reject appellants' argument that the restrictive covenants are unenforceable for lack of consideration.

2.

Next, appellants assert that Missouri law restricts the kinds of contracts that can contain restrictive covenants and that the Stockholder's Agreement does not fall within this class of contracts. "The purpose of the restrictive covenant is to protect an employer from unfair competition." Schmersahl, Treloar & Co. v. McHugh, 28 S.W.3d 345, 350 (Mo. Ct. App. 2000). "Restrictive covenants that limit individuals in the exercise or pursuit of their occupations, standing alone, are contracts in restraint of trade that are unlawful in [Missouri]. However, a covenant not to compete that forms part of a legitimate transaction is often described as an 'ancillary restraint.'" JTL Consulting, L.L.C. v. Shanahan, 190 S.W.3d 389, 396 (Mo. Ct. App. 2006) (citations omitted). The Missouri Court of Appeals discussed the types of agreements to which restrictive covenants may be ancillary in Renal Treatment Centers-Mo., Inc. v. Braxton, 945 S.W.2d 557 (Mo. Ct. App. 1997). The court stated, "Promises imposing restraints that are ancillary to a valid transaction or relationship include the employer-employee and buyer-seller relationships and partners against partnerships." Id. at 563. The court also noted that "this [was] *not* an exclusive list." Id. (emphasis added). The Missouri Court of Appeals lengthened this nonexclusive list in JTL Consulting, to include partnership agreements, independent contractor agreements, and shareholder agreements in close corporations. 190 S.W.3d at 396.

Here, MHM is a professional corporation under Missouri law. Professional corporations are governed by the law of general corporations, but additional statutory provisions specific to professional corporations must be read in conjunction with, and take precedence over, general corporation law. See Mo. Rev. Stat. § 356.031. We find no Missouri authority addressing whether a restrictive covenant can be ancillary to a shareholder's agreement for a professional corporation. "When there is no state supreme court case directly on point, our role is to predict how the state supreme court would rule if faced with the issues before us." Northland Cas. Co. v. Meeks, 540 F.3d 869, 874 (8th Cir. 2008) (quotation omitted). Missouri courts have expressly stated that the list of agreements, which they have recognized as giving rise to a legitimate interest sufficient to sustain a restrictive covenant, is not exclusive. See JTL Consulting, 190 S.W.3d at 396; Renal Treatment Centers, 945 S.W.2d at 563. Because JTL Consulting provides that restrictive covenants can be ancillary to shareholder agreements in close corporations, see 190 S.W.3d at 396, and professional corporations are "a special species of a close corporation," 1A William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 70.10 (perm. ed., rev. ed. 2002), we believe that the Missouri Supreme Court would hold that a stockholder's agreement between a professional corporation and a shareholder falls within the class of contracts wherein restrictive covenants are appropriate. Thus, the appellants' assertion that the restrictive covenants cannot be ancillary to the Stockholder's Agreement fails.

3.

Appellants also contend that the restrictive covenants are unenforceable for lack of a protectable interest. Missouri law requires that a party seeking to enforce a noncompete agreement in an employment situation prove that it has a "legitimate interest[]" in doing so. See AEE-EMF, Inc. v. Passmore, 906 S.W.2d 714, 719 (Mo. Ct. App. 1995). "Missouri courts have identified two such 'protectable interests.' These are customer contacts and trade secrets." Id. Customer contacts are

-18-

"essentially the influence an employee acquires over his employer's customers through personal contact." McHugh, 28 S.W.3d at 349 (quotation omitted); see also Schott v. Beussink, 950 S.W.2d 621, 625 (Mo. Ct. App. 1997) ("Missouri courts recognize that public policy approves employment contracts containing restrictive covenants because the employer has a proprietary right in its stock of customers and their goodwill . . . .").

MHM's client contacts are clearly a protectable interest under Missouri law. See AEE-EMF, 906 S.W.2d at 719. Appellants do not dispute that they had substantial contact with, and influence over, their clients while employed by MHM. However, they argue that MHM did not have a protectable interest in its client contacts for two reasons. First, appellants assert that MHM never acquired any rights to these customer contacts as the contacts remained the property of appellants upon the dissolution of Bertram Vallez. Second, appellants contend that MHM's contacts with the clients appellants solicited cannot be a protectable interest of MHM because such clients had been appellants' clients at Bertram Vallez prior to appellants' execution of the Stockholder's Agreement. We reject both of appellants' arguments.

First, although the Articles of Dissolution for Bertram Vallez provide that its remaining property was to be distributed among its shareholders, including appellants, the district court found that the only remaining property owned by Bertram Vallez was cash. This conclusion is supported by the language of the Termination Agreement, executed by Bertram Vallez and MHM, which states that Bertram Vallez "wishes to terminate its practice of public accountancy . . . and to make arrangements for the future servicing of its clients; and [MHM] is willing to provide accounting services to the clients of [Bertram Vallez] . . . as of [August 15, 2005]." (Appellants' App. 97.) The agreement further provides:

> 1.    Orderly Transfer of Client work papers. [Bertram Vallez] hereby agrees to provide for the orderly transition of client work papers for clients listed on Schedule A hereto. [MHM] agrees to provide

accountancy services to the Clients . . . , to retain such client files for a period of at least seven years . . . and to make such files available to [Bertram Vallez] and its current owners at its New Hope office upon reasonable notice.

(Id.) Thus, pursuant to the Termination Agreement, MHM took control of Bertram Vallez's client papers. Accordingly, appellants did not retain the rights to Bertram Vallez's contacts with the solicited clients.

Second, despite the fact that appellants had a relationship with the MHM clients that they solicited prior to joining MHM, Missouri law recognizes that "an employer may protect customer relationships even if the employee had contact with some of the same customers *before* joining the employer." Naegele v. Biomedical Sys. Corp., 272 S.W.3d 385, 389 (Mo. Ct. App. 2008) (emphasis added). In Naegele, the plaintiff, Mary Anastasia Naegele, was employed by Matria Health Care ("Matria") for 12 years where she "provid[ed] monitoring services to obstetric physicians specializing in managing high risk pregnancies." Id. at 386. She then worked as the national director of sales for Biomedical Systems Corporation's ("Biomedical's") Women's Health Services division, and, in taking the position, she executed a Confidentiality, Nondisclosure, and Noncompetition Agreement. Id. Naegele eventually decided to return to Matria. Id. at 387. After informing Biomedical of her decision, she filed a petition for declaratory judgment, and Biomedical counterclaimed, seeking an injunction. Id. Following the trial court's ruling for Biomedical, Naegele appealed, arguing that "Biomedical had no protectable interest in preexisting customers that she initially developed a relationship with when she worked at Matria because they were not contributed as part of an equity investment in a business venture and Biomedical did not assist in developing these contacts." Id. at 388-89 (quotations omitted).

The Missouri Court of Appeals rejected both arguments, explaining:

The fact that Biomedical did not purchase the customer contacts at issue as part of an equity investment in a business venture is immaterial. As

-20-

Naegele's employer, Biomedical had the right to require Naegele to develop strong relationships with any and all customers that she could. The evidence in the record showed that Biomedical invested considerable money, time, and effort to allow Naegele to develop, maintain, foster and preserve Biomedical's relationships with its customers, including the customers Naegele originally met during her Matria employment. Biomedical had a legitimate business interest in restraining Naegele from pursuing those customers with whom she developed or strengthened a relationship while working for Biomedical, *regardless* of whether those customer contacts originated with Naegele while she was working at Matria.

Id. at 389 (emphasis added). Thus, Naegele refutes the appellants' argument that their preexisting relationship with MHM's clients disqualifies MHM's contacts with such client from constituting a protectable interest under Missouri law. Accordingly, MHM had the requisite protectable interest—customer contacts—to enforce the restrictive covenants at issue.[22]

4.

Appellants next assert that the restrictive covenants are unreasonable in scope and, therefore, unenforceable. "The purpose of restrictive covenants is to protect an employer from unfair competition by a former employee without imposing unreasonable restraint on the employee." AEE-EMF, 906 S.W.2d at 719. Because "[r]estrictive covenants limit[] the exercise or pursuit of an individual's occupation

---

[22]We note that, contrary to the district court's determination that appellants breached the restrictive covenant by soliciting MHM's employees (Count II), MHM had no protectable interest in its employees. See McHugh, 28 S.W.3d at 347, 349-51 (holding that Missouri law does not allow covenants not to solicit former coworkers as such covenants are "in restraint of trade" in that they "restrict[] the flow of competitive information about the labor market, including the availability of opportunities and offers of employment to an employer's at-will workforce"). Because MHM was awarded no damages stemming from Count II, our determination has no impact on the damage award in this case.

[and] are in restraint of trade," such covenants "must be reasonable as to time and space" in order "to be valid and enforceable." Id. "The party claiming benefit of a noncompete clause within a contract has the burden of proving the reasonableness of the clause." Id.

The time period for the restrictive covenants at issue here is two years. This amount of time has been found reasonable under the "overwhelming weight of case authority" in Missouri. Alltype Fire Prot. Co. v. Mayfield, 88 S.W.3d 120, 123 (Mo. Ct. App. 2002). Although the restrictive covenants in this case are not restricted geographically, Missouri law recognizes that a customer restriction may substitute for an explicit geographical restriction. See Schott, 950 S.W.2d at 623-24, 627 (concluding that a two-year restriction on CPAs soliciting their former employer's customers, or doing any accounting work for them, was enforceable, without a geographical restriction, because "the covenant does not prevent employees from practicing in any particular geographical area, it merely prohibits them from soliciting employer's clients"); Mills v. Murray, 472 S.W.2d 6, 11-12 (Mo. Ct. App. 1971) (determining that a three-year restrictive covenant was reasonable, even absent a geographical restriction, because the former employee was only restricted from soliciting his former employer's clients such that he could even "conduct a competing business at [his former employer's] doorstep as soon as [he] left [his former employer's] service"). As the Schott Court observed, where "the specificity of limitation regarding the class of person with whom contact is prohibited increases, the need for limitation expressed in territorial terms decreases." 950 S.W.2d at 627 (quoting Seach v. Richards, Dieterle & Co., 439 N.E.2d 208, 213 (Ind. Ct. App. 1982)). Under Schott and Mills, the restrictive covenant at issue here is not unenforceable, even though it lacks a geographical restriction, because it only prohibits appellants from soliciting MHM clients—not from performing services for MHM's clients whom the appellants did not solicit. Furthermore, even if the restrictive covenant completely barred the appellants from doing any accounting work for MHM clients, the appellants would still be free to provide accounting services to

all non-MHM clients anywhere. Therefore, the scope of the restrictive covenants at issue here is reasonable under Missouri law.

5.

Finally, appellants allege that the restrictive covenants should not be given effect because they purportedly aid MHM in its alleged violation of antitrust law, i.e., MHM and CBIZ's operation under the APS.[23] MHM equates this argument with the affirmative defense of illegal contract and asserts that the appellants have waived the argument by failing to raise it until they opposed MHM's motion for summary judgment. See Fed. R. Civ. P. 8(c)(1) (listing illegality as an affirmative defense that must be raised in response to a pleading); Coury v. Prot, 85 F.3d 244, 255 (5th Cir. 1996) (affirming the trial court's determination that defendant had waived the affirmative defense of illegality of contract by failing to plead it). However, even if appellants have not waived their argument, it still fails for two reasons. First, appellants offer no authority demonstrating that the APS violates antitrust laws, and we find none. Second, appellants' argument is inconsistent with the purposes of antitrust law. "Heavy-handed competitive tactics alone do not constitute an antitrust violation . . . ." R.W. Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 487 (1st Cir. 1994).

> The purpose of the [Sherman Antitrust] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.

---

[23]The appellants do not argue that the restrictive covenants themselves violate antitrust laws. See McDonald v. Johnson & Johnson, 722 F.2d 1370, 1378 (8th Cir. 1983) ("[C]ovenants not to compete generally are not violative of the antitrust laws.").

Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993).  Here, appellants do not invoke the protections of antitrust law in order to protect the public.  Rather, they do so in order to avoid their contractual obligations that, as the preceding analysis establishes, are enforceable under Missouri law.  Accordingly, we find appellants injection of antitrust law into this contractual dispute inappropriate.[24]

In sum, we reject each of appellants' arguments and hold that the restrictive covenants contained in the Stockholder's Agreement are enforceable.

B.

Appellants next contend that, even if this court concludes that the restrictive covenants are enforceable, the award of liquidated damages must be reversed because the liquidated damages clause in the Stockholder's Agreement is unenforceable for two reasons.  First, appellants assert that the clause improperly calculates damages based on CBIZ's revenues rather than MHM's revenues.  Second, appellants argue that, even if the district court was correct in its determination that the clause refers to MHM's revenues, it does not approximate MHM's actual loss because MHM pays 85% of its revenues to CBIZ.

---

[24]We also note that the Code of Professional Conduct of the American Institute of Certified Public Accountants ("AICPA Code of Professional Conduct"), available at http://www.aicpa.org/Research/Standards/CodeofConduct/Pages/default.aspx (last visited June 1, 2010), referenced by both Missouri and Minnesota law, see Mo. Rev. Stat. § 326.256.1-.2; Minn. Stat. § 326A.02 subd. 5(5), expressly allows accounting firms to operate under the APS.  See AICA Code of Professional Conduct, Interpretations 101-14, 505-3.

In Missouri,

> [t]he general rule is liquidated damages clauses are valid and enforceable, while penalty clauses are invalid. Liquidated damages are a measure of compensation which, at the time of contracting, the parties agree shall represent damages in case of breach. Penalty clauses, on the other hand, are a punishment for breach.

Valentine's, Inc. v. Ngo, 251 S.W.3d 352, 354 (Mo. App. Ct. 2008) (quotation omitted). Thus, the issue here is whether the parties intended the provision to be a form of recoverable compensation—liquidated damages—or an unenforceable penalty provision meant to compel performance. In order to distinguish between the two, we ask whether: "(1) the amount fixed as damages [is] a reasonable forecast for the harm caused by the breach; and (2) the harm [is] of a kind difficult to accurately estimate." Id. (quotation omitted). If both requirements are met, the liquidated damages provision is valid. Id.

The "Liquidated Damages"[25] clause at issue here provides, in pertinent part:

> The Shareholder agrees that, in the event any revenues become payable to the Shareholder or to any other person[,] firm[,] or entity with which the Shareholder is affiliated in any capacity, as a result of a violation by the Shareholder of any of the covenants contained in this Agreement, the Shareholder shall pay to [MHM], or shall cause the person, firm[,] or entity with which [the] Shareholder is affiliated to pay to [MHM], an amount equal to the damages calculated pursuant to the shareholder's Executive Employment Agreement or other contractual arrangements with CBIZ shall apply.

---

[25]"While the label the parties attach to a provision is not conclusive, it is a circumstance to be considered when deciding whether the provision is to be considered liquidated damages or a penalty." Diffley v. Royal Papers, Inc., 948 S.W.2d 244, 247 (Mo. Ct. App. 1997). Thus, the fact that the clause at issue is entitled "Liquidated Damages" at least supports a determination that it is not an invalid penalty clause.

(Appellants' Add. 58.) Thus, although this provision provides for liquidated damages in the event of breach, the measure for such damages is not contained therein. Rather, the clause references, for this measure, the appellants' agreements with CBIZ. This reference is the basis for appellants' first argument—that the liquidated damage provision is unenforceable because it purportedly calculates damages based on CBIZ's revenue not MHM's revenue. However, we agree with the district court's determination that, although the Stockholder's Agreement borrowed the calculation for liquidated damages from appellants' agreements with CBIZ, MHM's fees were to be used in the calculation, not CBIZ's. CBIZ was not a party to the Stockholder's Agreement, and the purpose of the Liquidated Damages provision is to compensate MHM for appellants breach of their promises not to solicit MHM's clients, compete with MHM, or disclose MHM's confidential information. Therefore, as the district court correctly determined, the amount of liquidated damages is MHM's gross billings for their former clients from August 1, 2006 through July 31, 2008.[26]

Appellants also argue that the liquidated damages provision is a penalty in that "[t]he amount fixed is not reasonable because it does not approximate the actual loss that could result to MHM for the breach." (Appellants' Br. 60.) Appellants' argument is based on the fact that, under the Restated Administrative Services Agreement, MHM provides 85% of the fees it collects to CBIZ. However, appellants do not dispute that MHM was entitled to collect 100% of the gross fees from its clients or that MHM lost those fees when MHM clients, who appellants solicited, transferred their business to BWK. Furthermore, appellants provide no authority to support their position that the liquidated damages measure is unreasonable unless it is measured by MHM's net profits instead of the amount agreed upon in the Stockholder's Agreement.

---

[26]Although it appears that the language in Barton's Executive Agreement (the only appellant who had such an agreement) contained a different measure for liquidated damages, appellants do not raise this issue on appeal. Therefore, we do not address it. See Freeman, 911 F.2d at 56.

As previously stated, Missouri imposes two requirements in order for a liquidated damages clause to be enforceable—that the measure provided is "a reasonable forecast for the harm caused by the breach" and "the harm [is] of a kind difficult to accurately estimate." Valentine's, 251 S.W.3d at 354 (quotation omitted). The "reasonable forecast for the harm" requirement is satisfied here in that MHM receives an amount equal to the fees it received from the solicited client in the two years preceding the solicitation. With regard to the second requirement, appellants do not contend that the harm to MHM is of a kind that is easy to estimate. Furthermore, even had appellants made such an argument, we would reject it because, at the time the Stockholder's Agreement was executed, the parties could not have estimated the loss MHM would incur in the event appellants breached the agreements by soliciting MHM clients. See id. at 355 ("Where the difficulty of proof of loss is great, the court allows significant latitude in setting the amount of anticipated damages."). Accordingly, the liquidated damages clause is not an unenforceable penalty. Therefore, we affirm the award of liquidated damages in the amount of $1,369,921.

III.

For the foregoing reasons, we affirm the judgment of the district court.

_____